UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br> Plaintiff, <br> v. <br> **HENRY CERVANTES, ET AL.**, <br> Defendant. | Case No. 12-cr-00792-YGR <br><br> **PRETRIAL ORDER NO. 3 RE: DISCLOSURE AND *DAUBERT* MOTIONS** <br><br> Dkt. Nos. 645, 664, 667, 668, 669, 710, 721 |

On September 16, 2015, the Court held a pretrial hearing addressing pretrial motions filed (or joined) by defendants Henry Cervantes ("H. Cervantes"), Jaime Cervantes ("J. Cervantes"), and Alberto Larez ("Larez"). (Dkt. Nos. 645, 664, 667, 668, 669, 710, and 721.) Having carefully considered the papers submitted, the record in this case,[1] and the arguments of counsel, the Court makes the following rulings:

I.  **LEGAL STANDARDS**

   A.  **Rule 16(a)(1)(G) Disclosures**

Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure requires the government to give defendants a "written summary of any testimony" of an expert witness the government intends to introduce in its case-in-chief during trial under Federal Rules of Evidence 702, 703, or 705. The government's summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G). A district court may order expert disclosures from the government that are "complete, comprehensive, accurate, and tailored to the issues on which the expert is expected to testify," and can also exercise its

---

[1] In ruling on an earlier set of pretrial motions, the Court provided a summary of the second superseding indictment and case history. (*See* Dkt. No. 687 at 2-3.)

1  discretion to direct the government to "identify the documents or information that the expert reviewed in preparing his or her report…." *United States v. W.R. Grace*, 526 F.3d 499, 503-516 (such an order was "well within the bounds" of the district court's authority under Rule 16).

As other courts have noted, the Advisory Committee Note to the 1993 Amendment of Rule 16 indicated "that the bases and reasons must be sufficient to allow counsel to frame a *Daubert* motion (or other motion *in limine*), to prepare for cross examination, and to allow a possible counter-expert to meet the purport of the case-in-chief testimony." *United States v. Cerna*, No. 08-CR-0730 WHA, 2010 WL 2347406, at *1 (N.D. Cal. June 8, 2010). Thus, Rule 16 requires that the government summarize each specific opinion to be offered along with the basis therefore. *Id.* at *8.

### B. *Daubert* Motions

Under Federal Rule of Evidence 702, an expert may testify if, among other requirements, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Such evidence must also be relevant pursuant to Federal Rule of Evidence 401 and may be excluded pursuant to Rule 403.

Trial judges are charged with the responsibility of acting as gatekeepers to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). In order to fulfill this function as to scientific testimony, the trial court "must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue." *Daubert*, 509 U.S. at 580. However, the court has the "discretionary authority…both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Thus, while "a separate, pretrial hearing, outside the presence of the jury" may be advisable in certain circumstances, "trial courts are not compelled to conduct pretrial hearings in order to discharge the gatekeeping function." *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000).

## II. DISCUSSION

### A. Cell Site Location Experts

The government intends to call two special agents from the Federal Bureau of Investigation ("FBI") Cellular Analysis Survey Team ("CAST"). The defense challenges both the sufficiency of the disclosure as well as the underlying reliability and relevance of the anticipated testimony.

#### 1. *Sufficiency of Disclosure*

Defendants previously filed motions challenging the sufficiency of the government's cell site location expert disclosures under Federal Rule of Criminal Procedure 16(a)(1)(G). (Dkt. Nos. 645-48.) On July 28, 2015, the Court issued an order that reserved ruling on that aspect of the disclosure motion and ordered the government to provide cited disclosure documents to the Court. (Dkt. No. 680.) The Court is now in receipt of those materials and finds the disclosure in question was sufficient.

The government provided the defendants with an expert disclosure letter that included the names of two anticipated cell site location experts with CAST—Michael Easter and Victor Nguyen. The letter detailed the government's intention to call these agents to offer expert testimony on the operation of cell phone networks and the use of historical cell site data to determine the general location of cell phones at the time of a particular call or text message transmission. Defendants were provided with the experts' CVs, call detail reports, explanatory documents including term definitions and e-mails, and analysis reports, including summaries of the methodologies employed and the experts' conclusions. The defendants were also provided with slides depicting the purported map locations of "pertinent" cell phones (including one associated with Larez) around the time of the alleged Oakland double murder in 2011. The disclosures included call detail reports, explanatory documents, e-mails, explanation of the employed methodology and discussion of a field test which, according to the government, took place in December 2012. (*See* Dkt. No. 692 at 3.)

The defendants argue the government must supplement its disclosure because it "does not provide a clear description of the timing of its cell phone coverage experiments or how it relates

3

these to the time of the charged crimes." (Dkt. No. 645 at 10.) The defendants seek information regarding the basis for the agents' opinions, namely: (1) whether their knowledge of the reception area of certain cell towers is based on anything other than a field test to map the towers in question; and (2) the foundation for their opinion that the data in question is applicable to this case (*i.e.*, whether the cell phones in question were in the control of defendants at the time in question).

First, the disclosure notes that the testimony in question is based on the experts' substantial background in the field, along with historical cell site data and a mapping of the reception area for the relevant cellular networks using the "JDSU E6474A-X Wireless Network Optimization Platform."

Second, the government disclosure letter plainly noted that the link between the cell phone numbers in question and defendants will be established through non-expert testimony. In light of their possession of disclosures that address these issues, defendants' challenges on these bases are not well-grounded. In any event, the defendants' since-filed *Daubert* motion indicates they were sufficiently able to raise reliability concerns based on the disclosures in hand. Thus, the Rule 16 motion on these grounds is **DENIED**.

### 2. *Motion to Exclude*

Defendants[2] move to exclude the testimony of the FBI's CAST members, "or any other so-called 'cell phone' communication experts who are purporting to testify about a retrospective analysis of cell phone call locations based on historical cell phone records." (Dkt. No. 664 at 1.) Alternatively, defendants request an evidentiary hearing on this issue. The motion is brought on several grounds:

(1) testimony of the proposed experts is not relevant under Federal Rule of Evidence 403, including because the testimony does not rest on a sufficient foundation about the identity of the individuals who possessed the phones on the dates covered, or sufficiently reliable records and cell site network information;

---

[2] H. Cervantes filed the motion (Dkt. No. 664), joined by Larez (Dkt. No. 671) and J. Cervantes (672).

(2) the expert opinion testimony is not admissible under Rule 702 and *Daubert* because the basis and methodology are not sufficiently reliable to permit testimony interpreting the historical cell phone records and location data for the jury;

(3) the analysis by the FBI CAST investigators depends on historical information and later experiments at an unspecified time after the data in question, such that they do not provide a reliable basis, per *Daubert* and Rule 702, for the experts' retrospective conclusions about cell phone location;

(4) the danger of unfairly prejudicing, confusing, or misleading the jury outweighs the probative value of the experts' testimony, warranting exclusion under Rule 403; and

(5) the historical phone records themselves are hearsay and therefore inadmissible, even if the expert opinions are admitted.

### a. Relevance

On the relevance argument, defendants contend that at least some of the testimony is irrelevant because the cell phones cannot be "definitively placed in the hands of given individuals at given times," and because one of the phones is linked to one of the victims, not one of the defendants. The government counters that the relevance of the testimony will be established through non-expert witnesses. The Court finds the testimony may be sufficiently relevant, to the extent the cell phones analyzed can be linked, directly or circumstantially, as claimed by the government, to the defendants, victims, or relevant third parties. Defendants' challenge on this point goes to weight, not admissibility.

### b. Reliability of Historical Cell Location Opinions Generally

Defendants next argue that the general methodology used by experts to link historical cell phone to specified locations is inherently unreliable. However, as defendants acknowledge, "the use of cell phone location records to determine the general location of a cell phone has been widely accepted by numerous federal courts." *United States v. Machado-Erazo*, 950 F. Supp. 2d 49, 56 (D.D.C. 2013) (quoting *United States v. Jones*, 918 F. Supp. 2d 1, 7 (D.D.C. 2013)). Both experts have previously been qualified and testified as experts in numerous federal courts, including throughout California. (*Id.*) The government further noted that neither expert will

testify as to the phones' precise locations—a primary concern raised by defendants which, in light of this concession, appears unfounded. (*Id*. at 4.) To the extent the agents "will testify how one cellphone moved between Vallejo and Oakland during and around that time, and how a second phone traveled from Hayward to the murder scene," the methodological foundation for such opinions is sufficient.

        c.     <u>Reliability of Cell Phone Location Opinions Based On Field Experiment</u>

Defendants next argue that the government has not made a sufficient showing that later "field experiments" of the cell phone coverage, as stated in the September 7, 2013 FBI CAST report, provide sufficient details of their methodology to show that the experiments are a reliable basis for opinions about specific cell phone locations during the events of September 2011. In particular, defendants raise concerns that the FBI CAST report fails to account for any differences between the types of phones, cell phone towers, and their respective reception properties, used during the events in September 2011 and the time of their December 2012 field experiments. The government counters that, as indicated in his report, Special Agent Nguyen made measurements "using the JDSU E6474A-X Wireless Network Optimization Platform in the area of the homicide location and other pertinent locations in December 2012 throughout the day and again at night." (Dkt. No 692 at 3:9-12.) He used the JDSU drive-test to map the actual radio frequency within particular cell tower sectors and used cell phones from the same carriers as the suspect cell phone numbers during this test. (*Id.* at 3:11-13.) The government further states that Nguyen will testify that he analyzed the towers and antennas to determine if any had been replaced or adjusted in the intervening period between September 2011 and December 2012, and that he "would not have conducted the JDSU drive-test" if such adjustments had occurred. (*Id.* at 3:14-16.)

Preliminarily, the Court finds that the delay between the time of the events in question and the field experiments conducted by the FBI CAST agents is significant, and the government has not explained adequately whether there were any differences in the cell phone or antenna characteristics, reception and wave propagation in its field test conditions as compared to those relevant to the facts here. Absent some additional foundation establishing that Nguyen accounted for these possible differences and had a reasonable basis for concluding that they were not

6

significant, the government's assurance that Nguyen "would not have conducted" the field experiment if he did not believe it to be reliable is not a sufficient basis for the Court to so conclude.

To the extent the government maintains its intent to offer opinions based on field tests, Special Agent Nguyen shall submit a supplemental declaration addressing the foundational issues by Friday, **October 9, 2015**.

### d. Additional Objections

Defendants object to admission of the historical cell phone data itself as hearsay, and contend that the evidence is more prejudicial than probative. They further object that, to the extent these experts testify, they should be required to provide "a full explanation of the methodological questions that are framed when a retrospective analysis of cell site locations, and cell site coverage, is being testified to;" and should be limited to "the opinion that they can only, at best, approximate the location of the radio device associated with a particular cell phone number to nearby cell sites[,] so that it is made clear to a jury that, unlike the movies, real life experts cannot purport to pinpoint cell phone location or movement based on historical records of the kind available here." (Dkt. No. 664 at 3.)

The probative value of the admissible evidence in this category appears to outweigh any undue prejudice, assuming a foundation is laid by the government to link the phones to the individuals through lay testimony. The Court notes that the phone records are a type of evidence normally relied upon by experts, and are likely to fall under a business record exception. With respect to the other objections, defendants will have an opportunity to question these experts on cross-examination. This Order is without prejudice to defendants' ability to object at the time of trial.

Finally, defendants also make certain requests as to jury instructions. Defendants may propose jury instructions on these topics along with their other proposed jury instructions at the proper time, and the Court will consider them.

Based on the foregoing, the Court **RESERVES** ruling on the admissibility of any opinions based upon the field test. To the extent the government seeks to use the results of the FBI CAST

field test, or for its experts to opine on pinpoint locations based on the results of that field test and analysis based thereon, the Court reserves its ruling until it has had an opportunity to review any supplemental declaration from Special Agent Nguyen. Absent sufficient foundation in any such supplemental declaration, the opinions will be excluded. The Court again notes that the government has represented that it does not intend to offer pinpoint location opinions.

The motion is otherwise **GRANTED IN PART** and **DENIED IN PART**, without prejudice to the defendants raising specific objections at trial as the evidence is presented. The government may offer general location testimony as stated above, assuming that it first establishes a foundation for the relevance of the phone numbers through other witnesses.

### B. Forensic Chemistry Expert

Defendants[3] filed a motion that "addresses itself only to the DEA analysis of the alleged drug evidence from DEA lab #7175298, and to DEA Senior Forensic Chemist Luke Skilfich." (Dkt. No. 667 at 3-4.) In its opposition brief, the government noted that Skilfich "is no longer with the DEA Western Lab and has relocated out of state and may not be available to testify," in which case they may resubmit the evidence for retesting by an alternative expert and provide new disclosures to the defense. (Dkt. No. 689 at 2.) In their reply, defendants request permission to file another *Daubert* motion if a new expert is identified. In light of these circumstances, the Court **ORDERS** the government to file disclosures as to their testifying forensic chemistry expert by no later than **October 2, 2015**. Finding that the motion may be mooted by the government's selection of an alternative expert, the motion is **DENIED WITHOUT PREJUDICE** and defendants may re-file it no later than **October 30, 2015**, if appropriate.

### C. Arson Experts

Defendants[4] filed a motion to exclude of limit the testimony of alleged arson or file investigation experts, including hydrocarbon sniffer testing evidence. (Dkt. No. 668.)

---

[3] H. Cervantes filed the motion (Dkt. No. 667), joined by Larez (Dkt. No. 671) and J. Cervantes (672).

[4] H. Cervantes filed the motion (Dkt. No. 668), joined by Larez (Dkt. No. 671) and J. Cervantes (Dkt. No. 672.)

8

Specifically, defendants move the Court to "exclude, or limit, the expert testimony from alleged fire or arson investigators about origin-of-fire opinions, including opinions about burn pattern observations, or hydrocarbon detector readings, obtained by the Oakland Fire Department and Oakland Police Department," and object to statements about the use of ignitable liquids. (*Id.* at 2, 4.) The government contends that the investigators would testify how the fire investigation was done in accordance with the basic principles of the National Fire Protection Association ("NFPA") 921 standard entitled "Guide for Fire and Explosion Investigations" and that the evidence they observed and photographed at the scene was consistent with arson and murder concealment, based on their education, training, and experience. In reply, defendants submitted the investigators' report containing the opinions they presumably would be called upon to provide at trial.

The Court has carefully reviewed the report. (Dkt. No. 705, "OFD Fire Investigation Report," Bates NF-000772 to NF-000777.) The Court finds that, while certain factual statements in the report may be the subject of admissible testimony, the Court cannot determine that the portions stating opinions will be admissible without a *Daubert* hearing. More specifically, the Court requires a *Daubert* hearing to determine whether the expert testimony of investigators Sabatini and Goodfellow will be admitted on the question of whether the fire was intentionally set, including opinions about: (1) the presence of accelerants; (2) hydrocarbon detector device readings; and (3) the significance of burn patterns.

While the investigators briefly cited to the NFPA 921 standard in their report, and the government indicates that the investigators were trained in and following widely accepted NFPA 921 standards in their investigation, the report itself is conclusory and does not provide a reliable, testable basis for their opinions. The cases cited by the parties indicate that compliance with NFPA standards requires that "all hypotheses must be based on data that is 'capable of being verified.'" *United States v. Hebshie*, 754 F. Supp. 2d 89, 111 n. 39 (D. Mass. 2010) (citing NFPA 921 §§ 2.3.1–2.3.7); s*ee also Royal Ins. Co. of Am. v. Joseph Daniel Const., Inc.*, 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002) (setting forth six steps in NFPA 921 standards for investigation, by which "an investigator must: (1) recognize that a need exists to determine what caused the fire; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis based on the

9

data; and (6) test the hypothesis."); *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1059-60 (8th Cir. 2005) (upholding exclusion of an arson expert opinion testimony where "neither expert carefully examined this hypothesis of fire origin against empirical data obtained from fire scene analysis and appropriate testing, as required by NFPA 921"). Here, the proffered report does not explain how or whether the samples collected at the scene were tested. It does not explain how or whether the hydrocarbon detector results were corroborated by comparison evidence. And it does not indicate whether any other possible causes were considered and eliminated in order to reach the investigators' conclusion. For instance, while the report states that samples of cloth were obtained from the scene, it does not disclose that any testing or lab results of those samples or any comparison samples were obtained. In short, aside from a bald citation to the NFPA standard, the report does not offer indicia that NFPA 921 standards were followed in reaching the opinions stated.

Thus, to the extent the government wishes to offer any of the following opinions from the report (as opposed to factual observations), the Court must first conduct a *Daubert* hearing to ensure a reliable basis for their admissibility. Specifically, the opinions subject to this order, as stated in the report, are as follows:

- The cause of the fires was [d]etermined to be intentional. These fires are incendiary. (Bates NF-000772)
- I found no causes for the fires in these rooms…. (Bates NF-000775, ¶ 3.)[5]
- There was an odor of ignitable liquid on her body and an odor of ignitable liquid on the close on and around her body. OPD Fire Investigatory R. Goodfellow used a hydrocarbon detector which registered an indicator for an ignitable substance on and around the body…It appears most likely that the fire in this room was caused intentionally by someone pouring ignitable liquid on the clothing of the female victim and lighting the vapors with a cigarette lighter as the source of flame…. (Bates NF-000775, ¶ 4.)
- There were no causes of the fires found in this room. (Bates NF-000775, ¶ 5.)[6]
- I was able to smell the odor of an ignitable liquid when the Coroners lifted the

---

[5] Clarification is required. The report simply indicates that the room "showed smoke and heat damage," but does not indicate there was fire damage in this room.

[6] Again, clarification is required as to whether there was a fire or fire damage in this room.

10

- body. (Bates NF-000776, ¶ 5.)
- OPD Fire Investigator R. Goodfellow used a hydrocarbon detector which registered an indicator for an ignitable [s]ubstance on and around the body. (Bates NF-000776, ¶ 6.)
- It smelled of igitable [*sic*] liquid….It had a burn pattern [c]onsistent with the use of ignitable liquid. (Bates NF-000776, ¶ 7.)
- Opinion – Upon concluding my investigation at this time, based on my fire scene examination, burn patterns and witness statements, it is my determination that the ignition source was ignitable liquid vapors originating from a liquid substance which was poured on the cloth items on and/or near the bodies. The flame was most likely provided by a cigarette lighter which was found at the scene, It is my opinion that the materials first ignited in the fire on the female victim were the cloth materials around her body. It is my opinion that the materials first ignited in the fire with the victim were bedding, clothing, and the mattress near his body. In conclusion - It is my determination that these fires were intentionally set by a person or persons unknown to me at this time with the intent of concealment of the murders [NFPA921 22.4.9.3.5*A]- Murder Concealment] of the two victims. The fires were incendiary. (Bates NF-000777, ¶ 4.)

The government shall notify the Court and the defense no later than **October 2, 2015,** whether it intends to go forward with a *Daubert* hearing to permit this expert testimony. Such *Daubert* hearing shall be set on **October 13, 2015,** at 9:00 a.m.

### D. DNA Expert

Defendants[7] move for a finding that the government failed to provide timely, adequate disclosures for the bases of the DNA expert opinions, depriving them of the opportunity to make fully informed objections to the admissibility of the DNA evidence. They further argue that, based on the inadequacy of the disclosures, the Court should exclude or limit the expert testimony of government forensic serologist Virginia Sadl, with the Serological Research Institute ("SERI"), on the subjects of: (1) a given DNA sample matching a given defendant; and (2) the statistical probability the DNA match was a coincidence, based upon the potential occurrence of the same profile in a comparison population. Sadl's proffered testimony includes the opinion that defendant H. Cervantes was a major contributor to DNA recovered and statistics about the probability that

---

[7] H. Cervantes filed the motion (Dkt. No. 669), joined by Larez (Dkt. No. 671) and J. Cervantes (672).

11

the DNA came from another person. Absent the Court's immediate exclusion of the expert testimony, defendants seek a hearing to establish the admissibility of this expert testimony consistent with Rule 702 and *Daubert*. (Dkt. No. 669.)

### 1. *Sufficiency of Disclosure*

Defendants previously challenged the sufficiency of the government's serological expert disclosures under Federal Rule of Criminal Procedure 16(a)(1)(G), specifically inquiring as to the basis for the proffered testimony excluding or including individuals as likely DNA contributors ("specifically what is the literature, lab procedure or protocol, or generally accepted scientific standard that is referenced in opinions about inclusion or exclusion of contributors of DNA?"). (Dkt. Nos. 645-48.) The Court reserved ruling on the portion of the disclosure motion related to the DNA testing and ordered the government to provide cited disclosure documents to the Court. (Dkt. No. 680.) Defendants now renew their Rule 16 motion and seek to exclude the evidence as well. (Dkt. No. 669 and joinders.)

In opposing the instant motion, the government submitted a one-page declaration from Sadl stating that she "used, in general, a technique known as the product rule to determine the frequency of a coincidental inclusion." (Dkt. No. 691-1 ¶ 2.) She states that she derived the allele frequency for the sample DNA by comparison to a sample provided by Applied Biosystems, Inc. (ABI), and submitted, as an exhibit to her declaration, the allele frequency data for the ABI database. (*Id.* at ¶¶ 3, 4.) A statistic was determined for each of "U.S. Caucasian, African-American, and U.S. Hispanic" populations, and the report provided one estimated frequency based upon a weighted average of the frequencies in each of the three groups, based upon their proportion according to 2010 U.S. Census data. (*Id.* at ¶ 3.)

In reply, defendants argued that Sadl's declaration still failed to provide sufficient detail to address the concerns raised in their motion. (Dkt. No. 698.) The Court then ordered that the government submit a supplemental declaration from Sadl no later than September 4, 2015, addressing the concerns raised with greater specificity. After seeking and being granted an extension of time (Dkt. No. 718), on September 11, 2015, the government submitted a supplemental declaration of Sadl. (Dkt. No. 720.)

12

The supplemental declaration is brief, amounting to about a page-and-a-half of substantive text. Sadl sets forth her qualifications as an expert, which defendants do not challenge in their motions. She explains that estimated profile probabilities for "Caucasians, Hispanics, and African-Americans have been calculated and the calculations have been disclosed in the discovery materials," and that those probabilities were calculated in compliance with certain guidelines and recommendations, *i.e.*, the 2010 Scientific Working Group on DNA Analysis Methods ("SWGDAM") Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories (Attachment 3), and the 1996 recommendations of NRC II (National Research Council, 1996, *The Evaluation of Forensic DNA Evidence*). Sadl then provides examples of some of the Random Match Probability ("RMP") calculations for DNA samples obtained from certain items related to the crimes, and repeats that those calculations were "governed" by the appropriate cited guidelines. (*Id.* at 3:1-10.) She also states that the "set of (fifteen) loci and kit used for DNA analysis in this case are in common use, are generally accepted in the relevant scientific community, include the U.S. CODIS core loci, and are approved by the FBI for all forensic DNA analysis." (*Id.* at 3:14-18.) Finally, she states that she "reviewed the discovery materials provided by SERI in this case" and that they "contain all the information a competent expert would need to understand the DNA analysis that was undertaken and the method by which the probability estimates were obtained." (Dkt. No. 720-1 at 2:17-19.)

Defendants continue to object that this disclosure amounts to a "take my word for it" statement from the expert, without sufficient information about how the calculations she offers were performed, which databases were used, and the error rates or confidence intervals used.

Rule 16 requires the government to provide a complete and comprehensive description of "the bases and reasons" for an expert's opinions. Fed. R. Crim. P. 16(a)(1)(G). While the information is less than what would be necessary to establish the admissibility of the expert's opinions, the Court finds that it is sufficient to enable the defendants to frame their *Daubert* challenge, to prepare for cross-examination, and to determine whether to obtain their own counter-expert. Accordingly, the Rule 16 motions on this ground are **DENIED**.

13

### *2. Motion to Exclude Under* **Daubert**

Defendants argue that the expert report here is insufficient to establish what methodology the expert used and whether that methodology was reliable. Specifically, defendants contend that the information provided by the government does not say how the probabilities in the reports were calculated, whether a computer program was used, or what the basis for the calculations was. They also argue that the some of the databases that may have been used are close to, or more than 20 years old. And, again, they assert that Sadl does not provide sufficient information about the calculations performed, the databases selected, and the error rates or confidence intervals used.

Under *Daubert*, to determine whether an expert's methods are reliable, and therefore admissible as evidence, the court must consider: (1) whether the method can be and has been tested; (2) whether the method has been subjected to peer review and publication; (3) the method's known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the method has general acceptance within the relevant scientific community. *Daubert*, 509 U.S., at 592-94.

Sadl's supplemental declaration addresses these questions, but in a mostly cursory and conclusory manner. The Court acknowledges that the Ninth Circuit has upheld a trial court's finding that the product rule generally, as a statistical methodology, meets *Daubert*'s standards for reliability. *See United States v. Chischilly*, 30 F.3d 1144, 1155 (9th Cir. 1994); *see also United States v. Pritchard*, 993 F.Supp.2d 1203, 1207 (C.D.Cal. 2014) (finding expert opinion as to population frequency opinion based upon product rule admissible). The Court also recognizes that the guidelines and standards Sadl's cites in her supplemental declaration are the same standards that the *Pritchard* court found would support admissibility of the expert statistical opinions proffered there. Nevertheless, Sadl's response fails to provide sufficient information for the Court to determine that the methodology she employed in analyzing the DNA samples here, and her calculations and opinions based thereon, are reliable without more specific information about how she conducted her analysis.

For these reasons, and in order to fulfill its gatekeeping function properly, the Court **ORDERS** and **SETS** a *Daubert* hearing on **October 13, 2015,** as to serologist Sadl.

14

**E. Motion for Permission to File Motion to Suppress (Dkt. No. 710)**

On August 20, 2015, Defendant Henry Cervantes moved the Court for an order permitting him, if the facts so warrant, to file a motion to suppress evidence of historical cell phone records which he may have standing to move to suppress after the Court's determination of the *Daubert* motion related to historical cell phone records and cell phone calling pattern analysis. (Dkt. No. 710). Defendant's motion is based, in part, on recent decisions in *United States v. Graham*, No. 12-4659, 796 F.3d 332 (4th Cir. Aug. 5, 2015) and *In re Application for Telephone Information Needed for a Criminal Investigation*, CAND Case No. 15-XR-90304-HRL-1(LHK), Dkt. No. 30 (July 29, 2015, notice of appeal filed September 3, 2015, Dkt. No. 40). Defendant's request is **GRANTED** on the condition that any such motion must be filed no later than **October 23, 2015**.

**F. Larez Motion Regarding Continued Detention in Administrative Segregation**

On September 14, 2015, defendant Larez filed a motion requesting to be moved from administrative segregation where he is currently housed at the Glenn E. Dyer Detention Facility. At the hearing on September 16, 2015, the Court heard argument and took notice of information from the United States Marshal's deputy present. Based thereon, and upon the evidence of the safety concerns in this case, the Court **DENIES** the motion.

**G. Further Order Regarding Scope of *Jencks* Withholdings**

In order to manage effectively the upcoming trial, and balancing the competing needs of each party either to withhold *Jencks* materials for the purpose of witness safety versus to prepare adequately each defendant for trial, the Court hereby **ORDERS** as follows:

1. As part of the government's exhibit list due on October 2, 2015, the government shall identify the number of potential witnesses it may call but whose identities are not being disclosed due to concerns of witness safety.

2. By October 19, 2015, the government shall identify for each potential witness: (*i*) the scope of documents which are also being withheld on the basis of *Jencks* in terms of pages and/or quantity (*i.e.*, 50 pages or *x*-number of banker's box(es)) and (*ii*) the general nature/genre/classification of the documents.

With this information, the Court will be better able to determine when to order disclosures.

**III. CONCLUSION**

For the foregoing reasons, the Court **ORDERS** as follows:

a. Defendants' Motion for Disclosure of Sufficient Rule 16(a)(1)(G) Disclosures with respect to cell phone experts (Dkt. No. 645) is **DENIED**.

b. On Defendants' Motion to Exclude or Limit the Testimony of FBI or Other Witnesses Testifying About Cell Phone Communications and Locations (Dkt. No. 664), the Court **RESERVES** ruling on the admissibility of any opinions based upon the field test pending review of any supplemental declaration by Special Agent Nguyen, to be submitted no later than Friday, **October 9, 2015**. The motion is otherwise **GRANTED IN PART** and **DENIED IN PART**, without prejudice to the defendants raising specific objections at trial as the evidence is presented.

c. Defendants' Motion to Exclude or Limit Testimony of DEA Criminalist/Drug Evidence Analyst or Any Other Drug Evidence Analyst Offered by the Government (Dkt. No. 667) is **DENIED WITHOUT PREJUDICE** to re-filing no later than **October 30, 2015.** The analysis shall be re-submitted no later than **October 2, 2015**.

d. Defendants' Motion to Exclude or Limit the Testimony of Alleged Arson or Fire Investigation Experts, Including Results of Alleged Testing Done with a Hydrocarbon Sniffer (Dkt. No. 668) is **GRANTED**. The opinions state in the report, as identified above, will not be admissible unless a proper foundation for reliability under *Daubert* is established. The government shall notify the Court and the defense no later than **October 2, 2015,** whether it intends to go forward with a *Daubert* hearing to permit this expert testimony, and, if so, the hearing will proceed on **October 13, 2015,** at 9:00 a.m.

e. Defendants' Motion for Adequate Rule 16 Disclosures Regarding DNA Evidence and Motion to Exclude or Limit Government DNA-Related Expert Testimony (Dkt. No. 669) is **DENIED** as to the further disclosures, but **GRANTED** as to the request for a *Daubert* hearing. The *Daubert* hearing will proceed on **October 13, 2015**, at 9:00 a.m.

f. Defendant H. Cervantes' Motion for Permission to File Motion to Suppress Historical Cell Phone Records That Were Not the Subject of Warrant Applications (Dkt. No. 710) is **GRANTED** on the condition that any such motion must be filed no later than **October 23, 2015.**

g. Defendant Larez's motion regarding administrative segregation (Dkt. No. 721) is **DENIED**.

**The Courtroom Deputy shall contact the parties to coordinate a scheduling conference call to occur during the week of September 28, 2015.**

This Order terminates Docket Numbers 645, 664, 668, 669, 710, 721.

**IT IS SO ORDERED.**

Dated September 22, 2015

*[signature]*
**YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE**